T.C. Memo. 1996-202


UNITED STATES TAX COURT


GARY L. LONSINGER AND NANCY L. LONSINGER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13729-94.                    Filed April 25, 1996.

        In 1989, Ps' boat, the PEDRO, partially sank as a
result of an underwater valve explosion causing three
feet of salt water to enter the steel hull.  In the
following year, Ps received a reimbursement from their
insurance company, but claim that they suffered a
casualty loss in excess of the amount for which they
were reimbursed.  <u>Held</u>:  Ps have not established their
entitlement to a casualty loss deduction under sec.
165(a), (h), I.R.C.

Gary L. Lonsinger and Nancy L. Lonsinger, pro se.

<u>Louise R. Forbes</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined that the following
deficiencies are due from petitioners:

| Year | Income Tax | Additions to Tax Sec. 6662(a)* |
|------|-----------|-------------------------------|
| 1989 | $10,242 | $2,048 |
| 1990 | 1,639 | -0- |
| 1991 | 2,972 | 594 |

*We note that in 1989, Pub. L. 101-239, sec. 7721(a), 103
Stat. 2395, 2400, as part of the amendments to subchapter A of
chapter 68, repealed previous section 6662(a), which had provided
for certain additions to tax.  The repeal was effective for
returns the due date for which (determined without regard to
extensions) was after December 31, 1989.  Thus, respondent's
determination as to additions to tax under former sec. 6662(a) is
improper.

Unless otherwise indicated, all section references are to
sections of the Internal Revenue Code in effect for the years at
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

Respondent has made a number of concessions, including the
concession that there are no additions to tax.  The only issue
remaining for decision is whether petitioners are entitled to a
casualty loss deduction for 1990.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated
herein by this reference.

Petitioners resided in Durham, New Hampshire, when they
filed their petition.

In late 1985, Gary L. Lonsinger (petitioner) began discussions with Pedro-Holland about the possibility of bringing a line of vessels manufactured by Pedro-Holland to the United States for resale.  These vessels had no performance history in the United States.  Petitioner and his wife, Nancy L. Lonsinger (petitioners), negotiated with Pedro-Holland for about a year, and in 1986, ultimately reached an agreement whereby petitioners would represent Pedro-Holland in the United States and would bring the first boat into the United States for eventual sale. The boat, called the "PEDRO", was built in Holland and delivered to petitioners in the United States in July, 1987.

Petitioners understood that one of the requirements of U.S. Customs is that, if a foreign-built boat is imported, it cannot be sold for a commercial use within the 12 succeeding months, and if the boat is imported as a pleasure craft, then a substantial import duty must be paid.  Consequently, it was agreed that the PEDRO would be delivered "stripped" and would be outfitted by petitioners in the United States, which would take a substantial amount of time to complete.  When delivered to petitioners in the United States, the boat had no electronics on it, and lacked an oven, a refrigerator, generators, a washer-dryer, furniture, drapes, and carpeting.

The PEDRO was a 47-foot twin diesel motor yacht, the hull of which was made of carbon steel. The exterior of the hull was zinc chromate bonded for corrosion resistance purposes, but the interior of the hull was not so bonded.

The outfitting of the PEDRO was completed in July or August of 1988. In December, 1987, before the outfitting was completed, Northrop and Johnson, petitioners' marketing representative, had suggested an asking price of $520,000 for the boat. In September, 1988, Durham Trust Bank issued a mortgage on the completed boat in the amount of $321,000, which was approximately the amount petitioners were required to pay Pedro-Holland, having been given one year "free financing" from the delivery date in July, 1987.

Shortly thereafter, petitioners and Northrop and Johnson agreed to advertise the boat for sale at a price of $465,000. In November, 1988, petitioners decided that, due to their heavy carrying charges and to obtain a quick sale, they would reduce the asking price to $396,000, which petitioners figured was just below their "total base cost" of $402,000.

On February 7, 1989, a valve exploded on the boat, creating a two-inch hole five feet below the water line. Since the boat weighed 40 tons, the explosion created a "geyser" inside the hull. With the prompt intervention of the U.S. Coast Guard, the boat was kept from totally sinking, but took three feet of water

in the engine room, which destroyed both engines, transmissions, all electrical gear, all of the electronics, the wiring, and the air conditioning system.  In 1990, petitioners accepted $110,000 from USF&G in settlement of their insurance claim.  After the partial sinking, the PEDRO was repaired, and was declared seaworthy in September, 1990.

In the summer of 1990, petitioners filed suit against Pedro-Holland in an attempt to recover both the devaluation of the boat caused by salt water contamination, and unreimbursed expenses.  USF&G filed jointly with petitioner to recover from Pedro-Holland the $110,000 it paid to have the boat repaired.

At the suggestion of the bank mortgagee, petitioners moved the boat to Florida in November, 1991.  On November 15, 1991, Durham Trust Bank, the mortgagee, was closed by the FDIC and "froze" petitioner's assets.  It was petitioner's understanding that this action was taken because of criminal activity that happened in the bank.  In March, 1994, the FDIC permitted petitioners to sell the boat.  Petitioners realized $85,000 on the sale.

Petitioners' lawsuit against Pedro-Holland came to trial in January, 1994.  The judge in the case excluded petitioners' expert witnesses on motion of opposing counsel, so petitioners did not recover from Pedro-Holland.  Petitioners did, however, recover $30,000 from their attorney.

On their 1990 Federal income tax return, petitioners claimed a $100,000 casualty loss. This amount represented the difference between petitioners' estimate of the PEDRO's fair market value of $475,000 before the casualty, and petitioners' estimate of the PEDRO's fair market value of $265,000 immediately after the casualty, which petitioners then further reduced by the $110,000 insurance recovery to arrive at the $100,000 casualty loss figure.

On May 22, 1991, petitioners filed Form 1045 (Application for Tentative Refund) carrying back their 1990 net operating loss to the tax years 1987 and 1988.

On September 4, 1991, William Hodgens, Director, Northrop and Johnson, advised by letter that, due to a number of factors itemized in the letter (some of which related to the damage suffered by the PEDRO), "I feel a realistic market value for PEDRO is in the area of $285,000.00 to $320,000.00."

OPINION

Respondent concedes that petitioners incurred a casualty loss as a result of the partial sinking of the PEDRO on February 7, 1989, but contends that the loss, if any, was sustained in 1994, and not in 1990, as claimed by petitioners. Respondent argues that it was not until 1994, when the lawsuit against Pedro-Holland was resolved, that petitioners knew whether or not they would be further compensated. Respondent also challenges

the amounts used by petitioners in computing the amount of the casualty loss on their 1990 return.

Petitioners argue generally in support of the position taken on their return.

Section 165(a) provides a deduction for losses not compensated for by insurance or otherwise.  Section 165(h) deals with the treatment of casualty gains and losses.  Although petitioner testified that he was in the business of buying and selling boats, for which he held two franchises, and petitioners included a Schedule C relating to boat sales with their 1990 return, they claimed the loss from the partial sinking of the PEDRO as a loss from a casualty relating to personal use property, for reasons not readily apparent, and reduced the loss by $100, as provided by section 165(h)(1), and 10 percent of their adjusted gross income, or $4,032, as provided by section 165(h)(4)(A).

As already noted, respondent challenges both the year in which any casualty loss deduction may be claimed by petitioners, and the amount of the loss.  For reasons hereafter discussed, we believe that petitioners have correctly chosen 1990 as the year for which to claim any casualty loss, but, based on the record before us, that petitioners are entitled to claim no casualty loss in any year from the partial sinking of the PEDRO.

The regulations provide the method for determining the amount deductible.  Section 1.165-7(b)(1), Income Tax Regs., provides:

> (b)  Amount deductible--(1) General rule.  In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either--

> (i)  The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

> (ii)  The amount of the adjusted basis prescribed in sec. 1.1011-1 for determining the loss from the sale or other disposition of the property involved.  However, if the property used in a trade or business or held for the production of income is totally destroyed by casualty, and if the fair market value of such property immediately before the casualty is less than the adjusted basis of such property, the amount of the adjusted basis of such property shall be treated as the amount of the loss for purposes of section 165(a).

Fair market values are "generally" to be ascertained by "competent appraisal".  Sec. 1.165-7(a)(2)(i), Income Tax Regs.

Section 1.165-1(a), Income Tax Regs. (citing section 165(a)) provides that in computing taxable income under section 63, any loss actually sustained during the taxable year and not made good by insurance or some other form of compensation is allowable as a deduction, subject to certain limitations not relevant here. Section 1.165-1(d)(2)(i), Income Tax Regs., provides in general that a casualty loss is not "sustained" before the year in which

it can be ascertained with reasonable certainty that reimbursement for the loss will (or will not) be received.

As described in our Findings of Fact, petitioners computed the amount of their loss by subtracting their asserted $265,000 fair market value of the PEDRO immediately after the casualty from $475,000, petitioners' estimated fair market value of the PEDRO before the casualty, thereby arriving at a casualty loss of $210,000, further reduced by the $110,000 insurance recovery paid to them by USF&G in 1990. We believe some adjustments must be made to petitioners' computation, the effect of which is to eliminate any casualty loss deduction for any year.

Petitioners were unable to provide any formal appraisals that would establish the fair market value of the PEDRO, both immediately before and immediately after the underwater valve explosion that caused the loss. However, the record contains sufficient evidence by which these values can be established. Petitioner testified that in November, 1988, hoping to make a quick sale for reasons outlined in our Findings of Fact, he and his wife decided to lower the asking price to $396,000. We find this to be the "immediately before" fair market value of the PEDRO. Petitioner testified that "We had six appointments set for March and April of 1989 to show the boat, buyers that were coming in, flying in from out of town. Obviously, in New England, you don't show boats in January and February until the

weather starts to break." Since the $396,000 asking price was slightly below the PEDRO's $402,000 adjusted basis, and there appears to have been considerable interest in the boat, there is no reason to suppose petitioners could not have gotten their asking price. But since they were willing to sell the PEDRO for this amount, no higher fair market value figure was shown to be appropriate. Since the adjusted basis of the PEDRO, $402,000, was greater than the $396,000 fair market value immediately before the casualty loss, the regulations require that the latter figure be used.

Based on the record before us, we also find that the $110,000 insurance recovery accurately measures the decrease in the fair market value of the PEDRO as a result of the valve explosion. Thus, the fair market value of the PEDRO immediately after the February 7, 1989 explosion was $286,000. We recognize that section 1.165-7(a)(ii), Income Tax Regs., provides that the cost of repairs to the property damaged can be acceptable, under certain circumstances, as evidence of the loss of value. Petitioner testified that he spent "about $38,000 in repairs out of my own pocket of things that they [USF&G] wouldn't pay for." But petitioner neither specified the items he claims to have paid for that were not reimbursed, nor supported his claim by any receipts, checks, or other evidence that would, in an objective

manner, support his claim.  We cannot, therefore, allow the $38,000 as a deductible casualty loss.

We need not address respondent's argument that 1994, and not 1990, was the proper year in which petitioners could claim a casualty loss deduction.  Respondent makes this argument because 1994 was the year in which petitioners settled their claim against Pedro-Holland for $30,000.  We would simply point out that this recovery had no bearing on the computation of the amount of any unreimbursed loss suffered by petitioners.

As a final word, we would note that with regard to 1994, petitioners' accountant, Charles C. Brewster, testified that in computing the tax consequences of petitioners' ultimate disposition of the PEDRO in 1994, he subtracted from basis the $100,000 casualty loss taken on the 1990 return.  Since we have sustained respondent's disallowance of this deduction, petitioners may be in position to recompute to their advantage the tax consequences of the sale of the PEDRO.

To reflect the foregoing and concessions by respondent,

<u>Decision will be entered under</u>

<u>Rule 155.</u>